# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2010          Decided December 28, 2010

No. 10-1034

GUY P. RIORDAN,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities and Exchange Commission

*Jason Bowles* argued the cause for petitioner. With him on the briefs was *Caren I. Friedman*.

*Luis de la Torre*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for appellees. With him on the brief were *David M. Becker*, General Counsel, Securities and Exchange Commission, *Mark D. Cahn*, Deputy General Counsel, Securities and Exchange Commission, *Jacob H. Stillman*, Solicitor, Securities and Exchange Commission, and *Dimple Gupta*, Attorney, Securities and Exchange Commission.

Before: TATEL, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The New Mexico State Treasurer's Office invested some of the state's revenues in securities. From 1996 to 2002, the Treasurer's Office selected Guy Riordan's brokerage firms for many of those transactions. But the process for choosing brokerage firms was corrupt: Riordan paid kickbacks to New Mexico's Treasurer for the business. The crooked scheme ultimately unraveled amid a series of government investigations and enforcement actions. Relevant here is an action brought by the Securities and Exchange Commission, in which the SEC found Riordan liable for various violations of the securities laws and imposed heavy sanctions on him.

In this Court, Riordan primarily argues that the SEC's findings of fact lacked sufficient evidentiary support and that some of the SEC's sanctions were imposed for conduct that occurred outside the statute of limitations. We disagree and therefore deny Riordan's petition for review.

I

The New Mexico state government regularly invested some of its revenue in securities so as to earn a return on funds that would otherwise sit idle in the state treasury. Michael Montoya became New Mexico's Treasurer in 1995. He prolifically abused his office, steering state securities transactions to those who paid him kickbacks and bribes. Montoya was eventually nabbed, and in 2005 he pled guilty to extortion under color of official right, in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 2. Montoya agreed to cooperate in further investigations.

After his arrest and as part of his post-plea cooperation, Montoya told the FBI that Guy Riordan had paid him kickbacks in return for channeling state transactions to Riordan's brokerage firms. Although the Department of Justice did not file criminal charges against Riordan, the Securities and Exchange Commission brought a civil enforcement proceeding against him for violation of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5. *See* 15 U.S.C. § 77q(a) (Securities Act); 15 U.S.C. § 78j(b) (Exchange Act); 17 C.F.R. § 240.10b-5 (Rule 10b-5). Those provisions collectively prohibit the use of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of any security.

At Riordan's hearing before an SEC administrative law judge, Montoya testified at length and explained that, from 1996 to 2002, he had directed business to Riordan through a variety of devices. For example, Riordan had been allowed to see competitors' bids before placing his own and had been permitted to submit bids past the due date. In return for that preferential treatment, Riordan had typically given Montoya cash, between $300 and $3000, for each transaction.

Montoya's powerful testimony was supplemented by a plethora of additional evidence against Riordan. One of Montoya's associates testified that Montoya had told him to award state business to Riordan and had suggested that the business was in return for kickbacks paid by Riordan. The evidence also included a recording of a phone conversation in which Montoya and Riordan agreed to meet at a Bennigan's after Montoya requested money. Riordan also acknowledged that, in 2002, Montoya had repeatedly called Riordan demanding a kickback and that they had then met at a gas

station. In addition, the SEC Enforcement Division's financial expert submitted a report stating that Riordan often had received state business despite submitting the worst bid.

In his defense, Riordan produced his own expert's analysis of the Treasurer's Office records. Riordan also testified that he never paid Montoya in return for state business.

After hearing the evidence, the administrative law judge found that Riordan had paid extensive kickbacks to Montoya in order to land business from the State. She concluded that Riordan had thereby violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5, and she imposed a variety of sanctions.

Upon review, the full SEC upheld the administrative law judge's order in relevant part, affirming a host of sanctions on Riordan. The sanctions included: civil fines of $500,000; a bar on future association with securities brokers or dealers; an order to cease and desist from violations of the securities laws; and disgorgement of all commissions and bonuses Riordan derived from his dealings with Montoya, amounting to $938,353.78. Including prejudgment interest on the disgorged funds, the disgorgement order rose to $1,397,870.62. Riordan was thus forced to pay the Government a total of $1,897,870.62 in fines and disgorgement.

Riordan filed a petition in this Court under 15 U.S.C. § 78y(a)(1). Riordan contends that the SEC's findings of fact were not supported by substantial evidence, as required by 15 U.S.C. § 78y(a)(4), and that the administrative law judge improperly excluded some of his proffered evidence. Riordan also argues that most of the sanctions imposed on

him were based on conduct that occurred outside the statute of limitations. *See* 28 U.S.C. § 2462.

II

Riordan argues that the record does not contain substantial evidence that he paid Montoya kickbacks from 1996 to 2002. We disagree. The record overwhelmingly demonstrates that Riordan paid Montoya in return for state business. To recount just some of the most damning evidence: Montoya testified about the kickbacks at length and in detail; another witness corroborated key aspects of Montoya's testimony; Riordan himself admitted to having met Montoya twice in response to Montoya's demands for kickbacks; and the SEC's financial expert found that the Treasurer's Office records reflected a corrupt process – a conclusion that Riordan's own expert was largely unable to contradict.

The issue is closer with regard to four of the five transactions that Montoya's office awarded to Riordan in October 2002. Those four October 2002 deals are significant because they represent the portion of Riordan's conduct that supports $400,000 of the $500,000 that the SEC imposed in civil fines. (Riordan's pre-October 2002 conduct was outside the five-year statute of limitations for civil fines.) Those four October 2002 transactions involved *sales* of state securities. Riordan points out that Montoya testified that Riordan paid kickbacks only for state *purchases* of securities.

To begin with, Montoya's testimony on this issue was confused and equivocal. When first asked about sales, Montoya was not certain whether he had taken kickbacks on them, stating, "I'm not saying I didn't but I don't – I guess best guess is no." Transcript of Hearing at 188, *Guy P.*

*Riordan*, Securities Act Release No. 9085, Exchange Act Release No. 61153 (Dec. 11, 2009). But Montoya also appeared to have forgotten that nearly half the recorded transactions his office awarded to Riordan were sales, instead believing (incorrectly) that Riordan received very few sales. *Id.* Montoya did, moreover, state that he generally received a kickback on every transaction his office awarded to Riordan, and that no one in his office would award a sale without his approval. *Id.* at 181-82, 354-55. Thus, Montoya's confusion may show only that he forgot what types of transactions Riordan received, but remained certain that Riordan paid him for each transaction.

Moreover, other record evidence supports the SEC's conclusion that Riordan did in fact pay kickbacks on the four October 2002 sales. Montoya's assistant testified that Montoya directed him to steer both sales and purchases to Riordan. And the SEC's expert found that Riordan received the four October 2002 sales despite submitting the worst bids. Even Riordan's expert could not provide any persuasive explanation why Riordan would receive the state's business under those circumstances except for reasons of corruption.

This body of evidence regarding the October 2002 sales suffices under our deferential standard of review to sustain the SEC's conclusion that Riordan paid kickbacks in connection with those sales. *See Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010) ("The reviewing court may not substitute its own judgment for the agency's 'choice between two fairly conflicting views . . . .'") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

III

Riordan also contends that the Commission erred in approving the administrative law judge's exclusion of some of Riordan's proffered evidence. In particular, the administrative law judge prevented Riordan from introducing evidence showing that Riordan had helped unravel another of Montoya's corrupt deals. Riordan wanted to use this evidence to show that Montoya was biased against him and therefore should not be believed. But Riordan never demonstrated that Montoya knew anything about Riordan's role in that separate deal. Any evidence about Riordan's acts against Montoya's interest therefore was irrelevant; those acts could not have biased Montoya against Riordan if Montoya did not know what Riordan had done.

Moreover, even if the exclusion of this evidence constituted error, the error would be harmless. *See PDK Laboratories Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule . . . ."). It was already clear that Montoya disliked Riordan, rendering further evidence of that fact redundant. Further, the evidence against Riordan was utterly overwhelming on most issues. And on the one issue where it was not (the October 2002 sales), Montoya's testimony actually favored Riordan, meaning that the excluded evidence would not have helped Riordan with regard to the October 2002 transactions.

IV

Riordan's most significant argument concerns the statute of limitations. The key question centers on the general five-year civil statute of limitations for certain actions by the Government, 28 U.S.C. § 2462. *See 3M Co. v. Browner*, 17

F.3d 1453, 1455-57 (D.C. Cir. 1994). That statute reads: "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."

The SEC brought this action on September 25, 2007. Therefore, Riordan's conduct before September 25, 2002, falls outside the applicable statute of limitations.

The Commission based two of its sanctions – the bar on association with brokers or dealers and the $500,000 in civil fines – solely on Riordan's dealings with Montoya in October 2002. Those sanctions therefore pose no statute of limitations problem.

In levying the disgorgement order, however, the SEC relied not only on the October 2002 transactions but on the entirety of Riordan's misconduct, including the substantial portion of his wrongdoing that took place before September 25, 2002. The SEC's reliance on the pre-September 25, 2002, conduct for the disgorgement order is significant: Riordan was required to pay nearly $1.5 million in disgorgement and interest. But he would have to pay just a small portion of that amount if the SEC could consider only the five October 2002 transactions when calculating disgorgement.

The five-year statute of limitations in 28 U.S.C. § 2462 applies to an action for the enforcement of a "fine, penalty, or forfeiture." Does that list include disgorgement? This Court has said no. We have reasoned that disgorgement orders are not penalties, at least so long as the disgorged amount is causally related to the wrongdoing. *See*, *e.g.*, *Zacharias v. SEC*, 569 F.3d 458, 471-72 (D.C. Cir. 2009); *SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C. Cir. 1994); *SEC v. First*

*City Financial Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Because we have held that disgorgement is not a "civil penalty," the Court in *Zacharias* held that disgorgement was not subject to the five-year statute of limitations. 569 F.3d at 471-72. In light of our precedents, we must reject Riordan's similar argument here.[1]

The final question is whether the cease-and-desist order poses a statute of limitations problem. We think not. That order simply requires Riordan not to violate the relevant securities laws in the future. In a related context, we have stated that a cease-and-desist order is "purely remedial and preventative" and not a "penalty" or "forfeiture." *Drath v. FTC*, 239 F.2d 452, 454 (D.C. Cir. 1956). We see no reason for a different result here: The cease-and-desist order is not a "fine, penalty, or forfeiture" covered by the five-year statute of limitations in 28 U.S.C. § 2462. *Cf. Johnson v. SEC*, 87 F.3d 484, 487-89 (D.C. Cir. 1996).

---

[1] In reaching that conclusion in *Zacharias*, the Court focused on the meaning of "penalty" in 28 U.S.C. § 2462. The statute also applies to "forfeiture." It could be argued that disgorgement is a kind of forfeiture covered by § 2462, at least where the sanctioned party is disgorging profits not to make the wronged party whole, but to fill the Federal Government's coffers. Our precedents have not expressly considered that point in holding that there is no statute of limitations for SEC disgorgement actions. But *Zacharias*'s holding at least implicitly rejects that argument and is binding on us as a three-judge panel. Here, moreover, the disgorged moneys will apparently be returned to the New Mexico State Government and not retained by the U.S. Government. *See Guy P. Riordan*, Securities Act Release No. 9085, Exchange Act Release No. 61153 at 39 (Dec. 11, 2009).

10

* * *

We have considered all of Riordan's arguments and find them without merit.  We deny the petition.

*So ordered.*